# 25-1780

# United States Court of Appeals
# for the First Circuit

STATE OF NEW YORK,

*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the US Department of Health and Human Services,

*Defendants-Appellants.*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the District of Rhode Island

## MEMORANDUM OF LAW IN OPPOSITION TO
## EMERGENCY MOTION FOR STAY PENDING APPEAL

NICHOLAS W. BROWN
  *Attorney General of Washington*
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
(206) 464-7744

PETER F. NERONHA
  *Attorney General of Rhode Island*
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400

LETITIA JAMES
  *Attorney General of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6073

Dated: August 20, 2025

*(Complete counsel listing appears on signature pages.)*

*(Caption continued from front cover.)*

STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

V.

UNITED STATES DEPARTMENT OF HEALTH OND HUMAN SERVICES; SUSAN MONAREZ, in the official capacity as Acting Director, First Assistant to the Director, Principal Deputy Director of the Centers for Disease Control and Prevention; MARTIN MAKARY, in the official capacity as Commissioner of the U.S. Food and Drug Administration; US FOOD & DRUG ADMINISTRATION; ANDREW GRADISON, in the official capacity as Acting Assistant Secretary of the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; MARY LAZARE, in the official capacity as Principal Deputy Administrator of the Administration for Community Living; ADMINISTRATION FOR COMMUNITY LIVING; ARTHUR KLEINSCHMIDT, in the official capacity as Principal Deputy Assistant Secretary of the Substance Abuse and Mental Health Services Administration; SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION; CENTERS FOR DISEASE CONTROL AND PREVENTION,,

*Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT.................................................. 1

BACKGROUND ........................................................................ 3

    A.   Factual Background.................................................. 3

        1.   The Department of Health and Human Services ............. 3

        2.   The Directive and its effects............................. 5

    B.   Proceedings Below .................................................. 12

ARGUMENT .......................................................................... 15

POINT I

    THE SUPREME COURT'S STAY ORDERS IN OTHER LITIGATION DO NOT MANDATE A STAY HERE ............................................... 15

POINT II

    DEFENDANTS HAVE NOT MADE A STRONG SHOWING THAT THEY WILL LIKELY SUCCEED ON THE MERITS ........................................ 18

    A.   Defendants' Jurisdictional Arguments Lack Merit. .............. 18

        1.   Plaintiffs have standing. ................................. 18

        2.   Plaintiffs' claims are not subject to the Civil Service Reform Act. ........................................................ 20

        3.   Plaintiffs' claims are not subject to the Tucker Act........ 22

    B.   The Directive Violates the Administrative Procedure Act. ........................................................................ 23

**Page**

    1.    Plaintiffs' APA claim is reviewable. ................................ 23

    2.    The Directive is arbitrary and capricious. ...................... 24

    3.    The Directive is contrary to law. ..................................... 26

POINT III

    THE EQUITIES WEIGH STRONGLY AGAINST A STAY ............................... 28

CONCLUSION ......................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bennett v. Spear,*
    520 U.S. 154 (1997)............................................................................23

*Biden v. Nebraska,*
    600 U.S. 477 (2023)............................................................................18

*Community Legal Servs. in E. Palo Alto v. United States Dep't
    of Health & Hum. Servs.,*
    No. 25-2808, 2025 WL 1393876 (9th Cir. May 14, 2025)..................28

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025).........................................................................22

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020).........................................................................25-26

*Elgin v. Department of Treasury,*
    567 U.S. 1 (2012)...............................................................................20

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010)............................................................................21

*Labrador v. Poe,*
    144 S. Ct. 921 (2024).........................................................................16

*McMahon v. New York,*
    No. 24A1203, 2025 WL 1922626 (July 14, 2025) ..........................14-15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
    Auto. Ins. Co.,*
    463 U.S. 29 (1983)..............................................................................25

*New York v. McMahon,*
    No. 25-cv-10601, 25-cv-10677, 2025 WL 1463009
    (D. Mass. May 22, 2025) ....................................................................17

iii

| Cases | Page(s) |
|---|---|

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ........................................................ 24, 28

*Rhode Island v. Trump*,
  No. 1:25-cv-128, 2025 WL 1303868
  (D.R.I. May 6, 2025) .................................... 20-21, 23, 25, 27

*Somerville Pub. Schs. v. McMahon*,
  139 F.4th 63 (1st Cir. 2025) ........................................................ 28

*Trump v. American Federation of Government Employees*,
  No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) .................... 14-15

*Trump v. CASA, Inc.*,
  Nos. 24A884, 24A885, 24A886, 2025 WL 1773631
  (U.S. June 27, 2025) ........................................................ 13

*United States v. Fausto*,
  484 U.S. 439 (1988) ........................................................ 21

*Wiley v. Kennedy*,
  No. 2:25-cv-227, 2025 WL 1384768 (S.D.W. Va. May 13, 2025) ........ 21

## Laws

Further Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-47, 138 Stat. 649 ........................................................ 27

15 U.S.C. § 1341 ........................................................ 5, 10

20 U.S.C. § 3508 ........................................................ 3

21 U.S.C.
  § 387a ........................................................ 27
  § 387f ........................................................ 5, 10

29 U.S.C.
  § 669 ........................................................ 3-4
  § 670 ........................................................ 3
  § 671 ........................................................ 3-4, 26

**Laws**                                                             **Page(s)**

30 U.S.C.

    § 843 ................................................................................. 4

    § 937 ............................................................................... 26

    § 951 ............................................................................... 26

42 U.S.C.

    § 247b-3 ...................................................................... 4, 10

    § 247b-4a .................................................................. 4, 26

    § 247b-12 ......................................................................... 4

    § 3501 .............................................................................. 3

    §§ 9831-9852c ........................................................... 5, 10

    § 9902 .............................................................................. 5

## PRELIMINARY STATEMENT

Plaintiff States challenge defendants' decision to dismantle critical parts of the U.S. Department of Health and Human Services through a large-scale reorganization and reduction in force announced on March 27, 2025 (the Directive). Under the Directive, defendants eliminated functions required by law to promote the health and well-being of all Americans.

The U.S. District Court for the District of Rhode Island (DuBose, J.) preliminarily enjoined defendants from implementing the Directive in certain offices at the Centers for Disease Control and Prevention, as well as the Center for Tobacco Products, the Office of Head Start (including Head Start employees in Regional Offices), and a division in the Office of the Assistant Secretary for Planning and Evaluation. Defendants move to stay the preliminary injunction pending appeal. This Court should deny the motion.

First, defendants are unlikely to succeed on the merits of their appeal. Plaintiffs submitted dozens of unrefuted declarations establishing that defendants implemented the Directive in an arbitrary and capricious manner, and that the Directive eliminated entire teams responsible for performing statutorily mandated functions that are no longer being

performed. Indeed, the Secretary of the Department admitted that the Department did not carefully implement the Directive because it would have taken "too long." Defendants barely defend the legality of their actions in this motion, relying instead on procedural arguments that the district court properly rejected.

Second, the unrebutted record demonstrates that the Directive is presently causing and will continue to cause irreparable injury to plaintiffs. For example, the Directive deprives plaintiffs of promised resources and expertise needed to combat threats to public health and forces them to divert their own resources to replace diminished federal services. By contrast, defendants are not substantially harmed from an order that prevents further unlawful action pending appeal, and any harm defendants face from spending congressional appropriations to pay employees pending appeal does not warrant a stay. For similar reasons, the public interest is best served by preserving the status quo to ensure that the Department will continue to maintain staff to deliver the required services, pending this litigation.

# BACKGROUND

**A.     Factual Background**

**1.     The Department of Health and Human Services**

Congress has tasked the Department with enhancing and protecting the health and well-being of all Americans. *See* 42 U.S.C. § 3501; 20 U.S.C. § 3508. The Department oversees many subagencies, including the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), the Office of Head Start, and the Office of the Assistant Secretary for Planning and Evaluation. The Department provides a wide variety of statutorily required medical, public health, and human services.

For example, Congress mandated that the Department address and prevent work-related injury and illness across many workplaces, including mines, fire departments, oil and gas wells, and hospitals. *See* ECF No. 44-47 ¶¶ 4-5. These statutorily mandated functions are performed by the CDC's National Institute for Occupational Safety and Health (NIOSH), *see* 29 U.S.C. §§ 669(e), 671(a), and include conducting and publishing workplace health-and-safety research and guidelines, *id.* §§ 669(a)(1)-(3), (a)(6), (d), 670, 671(c)(2)); investigating health hazards

3

in workplaces, *id.* § 669(a)(6); performing health screenings for miners, 30 U.S.C. § 843; and developing technologies and equipment to enhance mine safety and health, 29 U.S.C. § 671(h).

Congress has mandated that the Department perform many other functions, including work to prevent and remediate lead poisoning in children, *see* 42 U.S.C. § 247b-3; and to conduct early detection and diagnosis of infant hearing loss, *see* 42 U.S.C. § 247b-4a. The Department, through the CDC, also operates the Pregnancy Risk Assessment Monitoring System (PRAMS)—a surveillance system that collects data nationwide regarding maternal and infant health outcomes, *see* 42 U.S.C. § 247b-12(a)(1), (2)(B); ECF No. 44-25 ¶¶ 9-11. And the CDC operates laboratories and other programs that perform testing and diagnostics for complex diseases, including antibacterial resistant infectious diseases; develop diagnostic tools for sexually transmitted infections; and conduct national disease outbreak surveillance and response. *See, e.g.*, ECF No. 44-20 ¶¶ 13-20; No. 44-25 ¶ 27.

In addition, offices within the CDC and FDA are required to regulate the tobacco industry and protect the public from the health risks of tobacco products. These offices are statutorily obligated, among other

things, to publish research on the health effects of cigarette smoke and to conduct compliance checks to ensure that tobacco products are not sold to minors. *See* 15 U.S.C. § 1341(a)(1); 21 U.S.C. § 387f; ECF No. 44-59 ¶¶ 37-47. The Department also administers Head Start, a statutorily mandated program that provides no-cost early childhood education and services to eligible families and children. *See* 42 U.S.C. §§ 9831-9852c; ECF No. 44-39 ¶ 8. And the Department is responsible for annually updating the federal poverty guidelines used to administer many federal and state benefits. *See* 42 U.S.C. § 9902(2); ECF No. 44-16.

### 2.  The Directive and its effects

On March 27, 2025, the Department announced its decision to terminate about 10,000 employees through a reduction in force (RIF). ECF No. 1-1, at 1; No. 1-2. The Department also announced that it would restructure by consolidating its 28 divisions into 15 and closing half of its 10 Regional Offices. ECF No. 1-2, at 1.

On April 1, 2025, the Department placed affected employees on immediate administrative leave, with formal termination scheduled for June 2. *See, e.g.*, ECF No. 44-46 ¶¶ 20-21; No. 44-47 ¶¶ 9-11. During leave, employees are not permitted to work and are locked out of their

computers and offices. *See, e.g.*, ECF No. 44-46 ¶ 20; No. 44-47 ¶ 11; No. 44-64, at 5.

The Department claimed that the Directive would implement the agency's new priority of ending "America's epidemic of chronic illness" and would make the agency "more responsive and efficient, while ensuring that Medicare, Medicaid, and other essential health services remain intact." ECF No. 1-1, at 2. But because of the Directive, numerous units within the Department were hollowed out or eliminated and are no longer performing statutorily required functions and other imperative public-health work. See *infra* at 7-11.

Shortly after the Directive's announcement, Secretary Robert F. Kennedy, Jr. admitted that it was anticipated "from the beginning" that 20% of terminated employees would need to be reinstated because of "mistakes" in the RIF. ECF No. 44-4, at 1. He also acknowledged that the Department failed to carefully consider which employees to terminate because it "takes too long" and he would "lose political momentum." ECF

No. 44 ¶ 4. He reiterated these sentiments in testimony before Congress on May 14, 2025.[1] *See* ECF No. 55 ¶¶ 5-6.

The Directive's evisceration of numerous subagencies and programs caused immediate harms to plaintiff States. These devastating effects are described in detail in plaintiffs' motion for a preliminary injunction (ECF No. 43, at 6-21, 38-53) and the decision below (Mem. & Order (Mem.)14-19, 52-54 (July 1, 2025), ECF No. 73). By way of example:

***Laboratory Services***. Because of the Directive, CDC infectious-disease laboratories were shuttered and stopped testing for drug-resistant bacteria and sexually transmitted infections. *See, e.g.*, ECF No. 44-20 ¶¶ 21-28; No. 44-25 ¶¶ 26-28.

The elimination of CDC laboratories hindered plaintiffs' ability to combat infectious diseases in their jurisdictions. In Rhode Island, for instance, the elimination "of the CDC's STD Prevention Laboratory Branch directly impacts the ability of [state agencies] to identify and

---

[1] As Secretary Kennedy predicted, the Department rescinded some of the initial terminations after this lawsuit and similar actions were filed. *See* ECF No. 52-1 ¶¶ 3-4; No. 70-1 ¶¶ 3-4. But the vast majority of terminations have not been rescinded. And there is no indication that any terminations were rescinded for many divisions of the Department that are the subject of plaintiffs' motion. *See, e.g.*, ECF No. 55-3 ¶¶ 5-9.

track resistant gonorrhea cases" despite the "regional emergence of highly resistant gonorrhea." ECF No. 44-23 ¶ 14. Moreover, after closing its laboratories, the CDC redirected testing requests to state laboratories, straining the limited resources of the few specialized state laboratories that can perform certain tests and leaving voids that state laboratories cannot fill. *See, e.g.*, ECF No. 44-20 ¶¶ 29-35; No. 44-21 ¶¶ 18-19. Plaintiffs were forced to seek alternate laboratories for testing, often having to pay more and locate alternative sources of funding. *See, e.g.*, ECF No. 44-22 ¶ 17; No. 44-23 ¶ 18. And plaintiffs lost the CDC's unique capability to track and respond to disease outbreaks nationally. *See, e.g.*, ECF No. 44-25 ¶¶ 26-28.

***Reproductive Health***. The Directive eliminated the team responsible for operating PRAMS, and the CDC halted all activities related to this important maternal and infant health surveillance system. ECF No. 44-25 ¶ 24; No. 44-59 ¶ 29. The system was taken offline, and plaintiffs lost access to usable data and the ability to monitor pregnancy-related outcomes in their States without creating their own monitoring systems—which would take at least a year, be cost-prohibitive, and would

ultimately be unable to replicate PRAMS' national dataset. *See, e.g.*, ECF No. 44-27 ¶¶ 5-6; No. 44-59 ¶ 30.

***Occupational Health***. The Directive eliminated almost all divisions and employees within NIOSH, halting the agency's activities to prevent work-related injury and illness. *See* ECF No. 44-47 ¶¶ 8-16. The mass termination of employees led NIOSH to suspend its processing of grant renewals and extensions that several plaintiffs rely on. *See, e.g.*, ECF No. 44-31 ¶¶ 11-20; No. 44-32 ¶¶ 13-16. As a result, occupational-health education centers in several States face imminent closure, hindering those States' ability to train occupational-health specialists. *See, e.g.*, ECF No. 44-31 ¶¶ 11-31. And NIOSH's failure to perform statutorily mandated research impedes plaintiffs' ability to track and prevent workplace dangers in their States, like health effects from exposure to extreme heat or hazardous materials. *See, e.g.*, ECF No. 44-52 ¶¶ 10-14.

***Environmental Health***. The Directive resulted in the termination of all but one of the 200 employees in the Division of Environmental Health Science and Practice. ECF No. 44-46 ¶ 20. Those terminations eliminated the Lead Poisoning Prevention and Surveillance Branch, including the statutorily required Childhood Lead Poisoning Prevention

9

Program—which could no longer perform statutorily mandated work to prevent and remediate lead poisoning in infants and children. ECF No. 44-46 ¶¶ 10, 17, 24-27; No. 44-25 ¶ 36; *see* 42 U.S.C. § 247b-3. These terminations also prevented the Department from administering environmental health grants to certain plaintiffs. *See, e.g.*, ECF No. 44-24 ¶¶ 12, 19.

*Tobacco Regulation.* The Directive effectively shuttered the offices responsible for regulating the tobacco industry. *See* ECF No. 44-59 ¶¶ 37-38, 46-47. Because of the Directive, plaintiffs lost access to statutorily required services, guidance, and data that they relied on to combat tobacco-related health effects in their States. *See, e.g.*, ECF No. 44-21 ¶ 7; No. 44-24 ¶¶ 16-17; No. 44-26 ¶¶ 19-20; No. 44-37 ¶¶ 21-30; *see* 15 U.S.C. § 1341, 21 U.S.C. § 387f.

*Child Development.* Major cuts to the Department's Administration for Children and Families disrupted the statutorily mandated Head Start program. ECF No. 44-39 ¶¶ 8, 13-24; *see* 42 U.S.C. §§ 9831-9852c. Due to the Directive, the Department's Head Start staff are "no longer available to offer training, technical assistance, monitoring, site visits, and other support to Head Start programs." ECF No. 44-38 ¶ 31. Further,

the Department terminated all staff in five Regional Offices (ECF No. 1-1), creating failures to provide technical assistance, conduct site visits, and forcing the cost of those services on to the States. *See* ECF No. 43, at 19-20.

***Federal Poverty Guidelines.*** The Directive eliminated the employees in the Office of the Assistant Secretary for Planning and Evaluation who were responsible for updating the federal poverty guidelines (ECF No. 55-7 ¶ 9), on which plaintiffs rely to administer federal and state benefits (*see, e,g.*, ECF No. 44-42 ¶¶ 11-12; No. 44-45 ¶¶ 8-9). Delays or errors in the annual revision to the guidelines, which requires complex work and multiple levels of review (ECF No. 55-7 ¶¶ 6-7), will create costly and burdensome administrative chaos for plaintiffs and could result in millions of residents being wrongly denied benefits (*see, e.g.*, ECF No. 44-42 ¶ 14; No. 44-57 ¶¶ 11-17).

11

**B.    Proceedings Below**

On May 5, 2025, plaintiffs filed this action to enjoin defendants from implementing the Directive. *See* ECF No. 1. Later that week, plaintiffs moved to preliminarily enjoin defendants' implementation of the Directive as to (1) the CDC, (2) the FDA's Center for Tobacco Products, (3) the Office of Head Start and Head Start employees in Regional Offices, and (4) the Office of the Assistant Secretary for Planning and Evaluation. *See* ECF No. 43, at 2.

On July 1, the district court granted plaintiffs' motion. The court found that plaintiffs had standing (*see* Mem. 13-23) and that the Civil Services Reform Act (CSRA) and Tucker Act did not deprive the court of jurisdiction (Mem. 23-30). On the merits, the court ruled that defendants' actions were reviewable under the Administrative Procedure Act (APA) (Mem. 32-37) and were likely arbitrary and capricious (*id.* 37-41) and contrary to law (Mem. 41-50).[2] The court also held that plaintiffs established irreparable harm (Mem. 50-54) and that the balance of the equities and public interest favored injunctive relief (Mem. 54-55).

---

[2] The court declined to address plaintiffs' non-APA claims. Mem. 50.

The district court preliminarily enjoined defendants from taking any additional actions to implement the Directive at the subagencies that are the subject of plaintiffs' motion. Mem. 56. At those subagencies, the court's order enjoined defendants from the further execution of any existing RIF notices, the issuance of any further RIF notices, and the placement of any additional employees on administrative leave. *Id.*

The parties subsequently filed multiple motions. Defendants moved to narrow the scope of the preliminary injunction, relying on the Supreme Court's intervening decision in *Trump v. CASA, Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631 (U.S. June 27, 2025). Defendants argued that the injunction should be limited geographically to activities "within the boundaries of" plaintiff States. ECF No. 75, at 4. Defendants also argued that plaintiffs did not provide evidence sufficient to warrant an injunction at all offices at issue within the four subagencies of the Department. *Id.* at 2-4. Plaintiffs opposed defendants' motion and cross-moved to clarify that the injunction requires defendants to reinstate employees to their posts at the enjoined subagencies. ECF No. 83.

While defendants' motion to narrow the injunction was pending, defendants also moved to vacate the injunction in its entirety or, alterna-

tively, to stay it pending a forthcoming appeal. ECF No. 78. Defendants relied on the Supreme Court's orders granting stays of preliminary injunctions pending appeal in *Trump v. American Federation of Government Employees*, No. 24A1174, 2025 WL 1873449 (U.S. July 8, 2025) (*AFGE*), and *McMahon v. New York*, No. 24A1203, 2025 WL 1922626 (July 14, 2025) (mem.).

The district court denied defendants' motion to vacate or stay the injunction. ECF No. 81, at 2. However, the court granted in part defendants' motion to narrow the injunction. ECF No. 89. Specifically, the court narrowed the injunction to apply only to certain offices within the four subagencies of the Department at issue. *See id.* at 3. The court declined to limit the injunction geographically and denied plaintiffs' motion to clarify that the injunction requires defendants to reinstate employees. *See id.* At the offices to which it applies, the injunction continues to prohibit defendants from executing any existing RIF notices, issuing any new RIF notices, and placing any additional employees on administrative leave. *Id.*

## ARGUMENT

## POINT I

### THE SUPREME COURT'S STAY ORDERS IN OTHER LITIGATION DO NOT MANDATE A STAY HERE

The Supreme Court's stay orders in *AFGE* and *McMahon* do not mandate a stay pending appeal here. *Contra* Mot. for Stay Pending Appeal (Mot.) 9-10.

In *AFGE*, the Court declined to address the legality of any agency RIF or reorganization plan, such as the Directive. 2025 WL 1873449, at *1. Instead, the Court stated only that the federal government was likely to succeed in defeating a challenge to an Executive Order and a memorandum from the Office of Management and Budget that directed agencies to prepare reorganization plans. *Id.* at *1. Neither the Executive Order nor the memorandum is challenged here. This case challenges the legality of a specific agency's implementation of a RIF and reorganization, an issue the Court expressly left open. *See id.*

In *McMahon*, the Supreme Court did not provide any reasoning for its stay of a preliminary injunction enjoining implementation of the Department of Education's reorganization plan. 2025 WL 1922626, at *1. The Court thus did not, as defendants erroneously contend, express any

view about any specific issue presented in *McMahon*, let alone on any issue that would bear on this action. If the Supreme Court had intended to express a view on any of the specific issues presented by the stay motion in *McMahon*, it could and would have said so. *See Labrador v. Poe*, 144 S. Ct. 921, 933-34 (2024) (Kavanaugh, J., concurring) (the Supreme Court issues unexplained stay orders to avoid creating "lock-in effect" on issues in other proceedings).

Moreover, as the district court correctly explained, this case is materially different from *McMahon*. *See* ECF No. 81, at 1. Among other distinctions, this case involves a different federal agency, different statutorily mandated functions, and different harms to the States, all of which bear on plaintiffs' standing and on consideration of the equities. *See* Mem. 14-20, 52-54. For example, because of the Directive, CDC infectious-disease laboratories were shuttered and stopped testing for drug-resistant bacteria and sexually transmitted infections, hindering plaintiffs' ability to combat infectious diseases in their jurisdictions and straining the limited resources of the few specialized state laboratories that can perform these tests. *See* Mem. 15, 21. As another example, the Directive eliminated the entire team responsible for operating PRAMS,

the health surveillance system that plaintiffs rely on to oversee preg-
nancy-related outcomes. *See* Mem. 15-16, 20. In addition, the preliminary
injunction here is narrower than the injunction in *McMahon* because it
is limited to specific offices within four subagencies of the Department
and does not require defendants to reinstate any employees. *See* ECF No.
89; *cf. New York v. McMahon*, No. 25-cv-10601, 25-cv-10677, 2025 WL
1463009, at *40 (D. Mass. May 22, 2025). The Supreme Court's
unexplained order in *McMahon* says nothing about the district court's
conclusions regarding the distinct factual record and narrow preliminary
relief here.

## POINT II

### DEFENDANTS HAVE NOT MADE A STRONG SHOWING THAT THEY WILL LIKELY SUCCEED ON THE MERITS

## A.    Defendants' Jurisdictional Arguments Lack Merit.

### 1.    Plaintiffs have standing.

A State has standing to challenge a federal official or agency's conduct if the State has suffered "a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Here, the district court correctly concluded that plaintiffs have standing based on the many harms that have been caused by the Directive—including those resulting from the discontinuance of statutorily required public-health information and services on which plaintiffs are entitled to and rely. Mem. 19-23. Defendants' contrary argument (Mot. 10-14) ignores the unrebutted factual record.

For example, because the CDC shut down its infectious-disease laboratories, testing requests that it would have performed were redirected to a small number of specialized state labs, straining those labs' limited resources and requiring plaintiffs to pay for more expensive testing. *E.g.*, ECF No. 44-20 ¶¶ 29-35; No. 44-23 ¶ 18. The shuttering of

these CDC labs also impeded plaintiffs' ability to track ongoing drug-resistant disease outbreaks in their States. *E.g.*, ECF No. 44-23 ¶¶ 19-20; No. 44-26 ¶¶ 42-45. The Department's discontinuance of PRAMS has hamstrung plaintiffs' ability to monitor and reduce maternal and infant morbidity and mortality in their States. *E.g.*, ECF No. 44-27 ¶¶ 4-6. The Directive's gutting of NIOSH will require closure of plaintiffs' occupational-health training programs (*e.g.*, ECF No. 44-31 ¶¶ 11-30); severely diminish plaintiffs' ability to operate surveillance programs for lead exposure and respiratory disease in high-risk industries (*e.g.*, ECF No. 44-32 ¶¶ 13-22); and undermine plaintiffs' ability to obtain or require NIOSH-certified safety equipment, such as respirators for firefighters (*e.g.*, ECF No. 44-35 ¶¶ 20-24).

Defendants also incorrectly contend that the injunction is broader than necessary because the court could instead have compelled defendants to provide any required information or services to plaintiffs. *Contra* Mot. 13-14. As the district court recognized, such an injunction would have been meaningless where the unrebutted record shows that there are insufficient personnel at the Department to deliver the information or services because defendants have terminated the very offices and

employees responsible for providing them. Mem. 23 & n.6. Indeed, defendants did not put forth any evidence showing that they plan to continue to provide the lost information and services or how they would be able to do so. *See id.*

### 2. Plaintiffs' claims are not subject to the Civil Service Reform Act.

The CSRA requires that administrative tribunals hear challenges by employees or unions to adverse employment actions taken against them by federal agencies. *See Elgin v. Department of Treasury*, 567 U.S. 1, 5 (2012). The district court correctly concluded that nothing in the text, structure, or history of the CSRA indicates that Congress intended these administrative-review procedures to apply to claims like those brought by plaintiffs here. *See* Mem. 23-28.

The CSRA applies only to employees and unions—not to States. *See Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 1303868, at *7-8 (D.R.I. May 6, 2025). Moreover, plaintiffs are not raising employment disputes; rather, they are challenging defendants' restructuring and elimination of offices, in part through the RIF, which has disabled the Department from performing its statutorily required and other core

public-health functions—to the detriment of plaintiff States. *See id.*; *Wiley v. Kennedy*, No. 2:25-cv-227, 2025 WL 1384768, at *10-11 (S.D.W. Va. May 13, 2025). Accordingly, plaintiffs' claims do not call for the application of the administrative bodies' expertise in employment disputes, and instead raise questions of administrative and constitutional law that "courts are at no disadvantage in answering." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010).

In addition, accepting defendants' argument would foreclose all meaningful judicial review over plaintiffs' claims. Mem. 26-27. But courts do not presume that Congress intended to foreclose meaningful judicial review—particularly when the statutory review scheme does not contain any suggestion of preclusion. *See Free Enter. Fund,* 561 U.S. at 489. Defendants' reliance on *United States v. Fausto*, 484 U.S. 439 (1988), is misplaced. *See* Mot. 16-17. The plaintiff there was a federal employee, and the claims he brought were the type of employment claims that the CSRA channels to administrative review and that call for agency expertise. *See* 484 U.S. at 442-43. Here, as explained, plaintiffs' claims do not fall within the CSRA's review scheme and do not call for agency expertise

because plaintiffs are not federal employees challenging personnel actions.

### 3.   Plaintiffs' claims are not subject to the Tucker Act.

Defendants are incorrect to argue that the Tucker Act precluded the district court from adjudicating plaintiffs' claims relating to the termination of grants. *See* Mot. 14. Although plaintiffs allege that the Directive has harmed some States because it has led to the failure of the Department to pay grant funds, those harms are not based on any alleged breach of the terms of any grant agreement. Instead, plaintiff States allege that the grants have not been paid because the departmental restructuring, elimination of offices, and termination of every employee in the units responsible for administering the grants upended the entire grant administration process. *E.g.*, ECF No. 1 ¶¶ 177, 216, 293. Although restarting the grant administration process may result in grant payments, the Tucker Act does not apply simply because "an order setting aside an agency's action may result in the disbursement of funds." *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).

**B.     The Directive Violates the Administrative Procedure Act.**

The district court correctly found that plaintiffs are likely to succeed on the merits of their APA claims. Defendants barely dispute the district court's analysis of the merits and argue chiefly that plaintiffs' APA challenge is unreviewable. Mot. 18-19.

**1.     Plaintiffs' APA claim is reviewable.**

The Directive is reviewable under the APA because it marked the "consummation of [defendants'] decisionmaking process" and produced "legal consequences." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). The Directive resulted in thousands of employees being placed on administrative leave, and most of these workers would have already been officially separated from the Department without an injunction. The Directive also had legal consequences: it has "essentially eviscerated many of the public health programs on which the States rely." Mem. 34. The Department's speculation that it may take further steps to reorganize does not make the defendants' already-made decision to engage in terminations and restructuring under the Directive any less final. *See Rhode Island,* 2025 WL 1303868, at *9.

This lawsuit is also not a general challenge to the Department's day-to-day operations. *Contra* Mot. 18 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990)). Instead, plaintiffs challenge a discrete and "identifiable action or event" that has caused plaintiffs harm—the Directive. *Lujan*, 497 U.S. at 899. The breadth of the Directive does not render it unreviewable. *See New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

## 2.    The Directive is arbitrary and capricious.

The district court correctly concluded that plaintiffs are likely to succeed on their claim that defendants failed to engage in reasoned decision-making in issuing and carrying out the Directive's reorganization and mass termination of 10,000 employees who performed thousands of different jobs across hundreds of different offices. Mem. 37-41. As the court explained, "the record is completely devoid of any evidence" that defendants considered the impact of their decision to "hastily restructure[]" the Department. Mem. 40. To the contrary, the Department declined to engage in a careful review before implementing the Directive because it would have taken "too long." ECF No. 44 ¶ 4; No. 55 ¶¶ 5-6.

Defendants likewise "failed to consider" many "important aspect[s]
of" the Directive, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), including the immediate and
significant disruption to agency operations and functions that would
follow from a sudden reorganization and elimination of a large portion of
the Department's workforce, *see Rhode Island*, 2025 WL 1303868, at *10.
And there is no indication that defendants considered the costs that the
Directive would impose on States and the public. *See Department of Home-
land Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Defendants' purported justifications for the Directive are similarly
conclusory and unsupported by any evidence. *See Rhode Island*, 2025 WL
1303868, at *11. Although the Directive purports to "implement the new
HHS priority of ending America's epidemic of chronic illness by focusing
on safe, wholesome food, clean water, and the elimination of environ-
mental toxins" (ECF No. 1-1, at 2), it does the opposite. The Directive cut
staff so that the Department's chronic-illness, food, water, and environ-
mental toxin-related programs, such as the Childhood Lead Poisoning
Prevention Program, can no longer operate. *See, e.g.*, ECF No. 44-46
¶¶ 10, 19-27. Likewise, although the Directive says it will save taxpayer

funds via staffing cuts, the changes it makes will have significant and unaccounted costs to public health. *See, e.g.*, ECF No. 44-28 ¶¶ 28-29.

Defendants do not address the merits of the district court's conclusion that the Directive is arbitrary and capricious, instead arguing that the Directive cannot be arbitrary and capricious because agencies have discretion to engage in RIFs. Mot. 18-19. But an agency's discretion as to personnel decisions cannot override its obligation under the APA to engage in reasoned decision-making. *Regents*, 591 U.S. at 16.

### 3.    The Directive is contrary to law.

The district court also correctly concluded that plaintiffs are likely to succeed on their claim that the Directive is contrary to law. *See* Mem. 41-50. Because of the reorganization and mass terminations under the Directive, the Department is no longer complying with its obligations under numerous federal statutes. For example:

- The National Center on Birth Defects and Developmental Disabilities is not performing statutorily mandated work relating to the early detection and diagnosis of newborn and infant hearing loss. ECF No. 44-27 ¶ 13; *see* 42 U.S.C. § 247b-4a.

- NIOSH is not performing statutorily mandated research into mine safety and health. ECF No. 55-3 ¶¶ 5-9; *see* 29 U.S.C. § 671(h)(3); *see also* 30 U.S.C. §§ 937(b), 951(a)-(b).

26

- The Center for Tobacco Products is not performing statutorily mandated work related to the regulation of tobacco products, including health communications and education projects. ECF No. 55-8 ¶¶ 7, 23-24; *see* 21 U.S.C. § 387a(e).

Defendants' arguments to the contrary (*see* Mot. 19) ignore the unrebutted factual record.

In addition, Congress has appropriated billions of dollars to the Department. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 649, 653-54. Because the Department is obligated to spend money appropriated by Congress, the failure to maintain staffing to perform these functions is contrary to law. *See Rhode Island*, 2025 WL 1303868, at *13-14.

# POINT III

## THE EQUITIES WEIGH STRONGLY AGAINST A STAY

The balance of equities, public interest, and irreparable harm weigh heavily against a stay. As the district court found, the Directive has caused and will continue to cause substantial and irreparable harms to plaintiffs and to the public, including the loss of statutorily required public health services, resources, data, guidance, policies, and expertise. Mem. 52-54. See *supra* at 7-11, 18-20.

By contrast, neither the government nor the public are substantially harmed from an order that prevents further unlawful action pending appeal and preserves the status quo. *See Community Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-2808, 2025 WL 1393876, at *6 (9th Cir. May 14, 2025); *New York*, 133 F.4th at 71. Although defendants may have "some risk of irreparable harm" from having to spend appropriated money to pay employees pending the conclusion of this appeal, that risk alone does not warrant a stay. *See Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025).

## CONCLUSION

The Court should deny defendants' motion for a stay.

Dated:  August 20, 2025

Respectfully submitted,

NICHOLAS W. BROWN
  *Attorney General of Washington*

By: */s/ Spencer W. Coates*
SPENCER W. COATES
KELSEY E. ENDRES
  *Assistant Attorneys General*
CYNTHIA ALEXANDER
WILLIAM MCGINTY
  *Deputy Solicitors General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

LETITIA JAMES
  *Attorney General of New York*

By: */s/ Daniel S. Magy*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
DANIEL S. MAGY
  *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6073
daniel.magy@ag.ny.gov

PETER F. NERONHA
  *Attorney General of Rhode Island*

By: */s/ Sarah W. Rice*
SARAH W. RICE (#1205724)
  *Deputy Chief*
  *Public Protection Bureau*
150 S. Main Street
Providence, RI 02903
(401) 274-4400

(*Counsel listing continues on next page.*)

29

KRISTIN K. MAYES
  *Attorney General of Arizona*

By: */s/ Alexa G. Salas*
ALEXA G. SALAS
  *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
(602) 542-3333

ROB BONTA
*Attorney General of California*

By: */s/ Crystal Adams*
CRYSTAL ADAMS
  *Deputy Attorney General*
MICHAEL L. NEWMAN
NELI PALMA
  *Senior Assistant Attorneys General*
KATHLEEN BOERGERS
VIRGINIA CORRIGAN
SRIVIDYA PANCHALAM
  *Supervising Deputy*
    *Attorneys General*
JESSE BASBAUM
JEANELLY OROZCO ALCALA
  *Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612-1499
(510) 879-3428

PHILIP J. WEISER
*Attorney General of Colorado*

By: */s/ David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000

WILLIAM TONG
  *Attorney General of Connecticut*

By: */s/ Michael K. Skold*
MICHAEL K. SKOLD
  *Solicitor General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

KATHLEEN JENNINGS
*Attorney General of Delaware*

By: /s/ Vanessa L. Kassab
IAN R. LISTON
  *Director of Impact Litigation*
VANESSA L. KASSAB
  *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

BRIAN L. SCHWALB
*Attorney General for*
  *the District of Columbia*

By: */s/ Andrew C. Mendrala*
ANDREW C. MENDRALA
  *Assistant Attorney General*
  *Public Advocacy Division*
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726

ANNE E. LOPEZ
  *Attorney General of Hawaiʻi*

By:*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
  *Special Assistant to*
   *the Attorney General*
KALIKOʻONĀLANI D. FERNANDES
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

ANTHONY G. BROWN
  *Attorney General of Maryland*

By: */s/ Michael Drezner*
MICHAEL DREZNER
  *Senior Assistant Attorney General*
  *Federal Accountability Unit*
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959

KWAME RAOUL
  *Attorney General of Illinois*

By: */s/ Alex Hemmer*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-3000

DANA NESSEL
  *Attorney General of Michigan*

By: */s/ Neil Giovanatti*
NEIL GIOVANATTI
  *Assistant Attorneys General*
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603

AARON M. FREY
*Attorney General of Maine*

By: */s/ Margaret Machaiek*
MARGARET MACHAIEK
  *Assistant Attorney General*
6 State House Station
August, ME 04333-0006
(207) 626-8800

KEITH ELLISON
  *Attorney General of Minnesota*

By: */s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

By: */s/ Justine M. Longa*
JUSTINE M. LONGA
JESSICA L. PALMER
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625
(609) 696-4527

RAÚL TORREZ
  *Attorney General of New Mexico*

BY: */s/ Astrid Carrete*
ASTRID CARRETE
  *Impact Litigation Counsel*
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060

DAN RAYFIELD
  *Attorney General of Oregon*

By: */s/ Elleanor H. Chin*
ELLEANOR H. CHIN
  *Senior Assistant Attorney General*
100 Market Street
Portland, OR 97201
(971) 673-1880

CHARITY R. CLARK
  *Attorney General of Vermont*

By: */s/ Ryan P. Kane*
RYAN P. KANE
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

By: */s/ Charlotte Gibson*
CHARLOTTE GIBSON
  *Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707-7857
(608) 957-5218

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, Daniel S. Magy, an attorney in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 5,060 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

 */s/ Daniel S. Magy*