# United States Court of Appeals
## For the First Circuit

No. 25-1780

STATE OF NEW YORK; STATE OF WASHINGTON; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WISCONSIN;

Plaintiffs, Appellees,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; SUSAN MONAREZ, in her official capacity as Acting Director, First Assistant to the Director, Principal Deputy Director of the Centers for Disease Control and Prevention; MARTIN A. MAKARY, in his official capacity as Commissioner of the U.S. Food and Drug Administration; U.S. FOOD AND DRUG ADMINISTRATION; ANDREW GRADISON, in his official capacity as Acting Assistant Secretary of the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; MARY LAZARE, in her official capacity as Principal Deputy Administrator of the Administration for Community Living; ADMINISTRATION FOR COMMUNITY LIVING; ARTHUR KLEINSCHMIDT, in his official capacity as Principal Deputy Assistant Secretary of the Substance Abuse and Mental Health Services Administration; SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION; CENTERS FOR DISEASE CONTROL AND PREVENTION;

Defendants, Appellants.

Before

Montecalvo, Rikelman, and Aframe,
Circuit Judges.

**ORDER OF COURT**

Entered: September 17, 2025

The government has moved for a stay pending appeal of the district court's August 12, 2025, order clarifying an earlier order that preliminarily enjoined the U.S. Department of Health and Human Services (HHS or "the Department") from further implementing its reduction-in-force (RIF) and restructuring plans for four of its sub-agencies.[1]  See Order of Aug. 12, 2025, New York v. Kennedy, No. 25-cv-196 (D.R.I.), ECF No. 89.  In a March 27, 2025, statement ("March 27 Communiqué"), HHS announced that it would "streamline the functions" of the Department, partly by terminating 10,000 employees through a RIF plan, consolidating sub-agencies, and reducing the number of regional offices.  Several days later, the Department began dismantling the sub-agencies and placed 10,000 employees on administrative leave.  The HHS Secretary acknowledged that the Department did not closely examine employees' job responsibilities before removing them because that would "'take[] too long' and would sacrifice 'political momentum.'"  For the reasons that follow, we deny the stay motion.

The plaintiffs are a group of nineteen states and the District of Columbia that filed suit on May 5, 2025, challenging on numerous grounds the March 27 Communiqué and the resulting dismantling of sub-agencies within the Department.  They sought a preliminary injunction of the Department's restructuring plans at four of those sub-agencies:  (1) the Centers for Disease Control and Prevention (CDC), (2) the Food and Drug Administration's Center for Tobacco Products (CTP), (3) the Administration for Children and Families' Office of Head Start (OHS) and regional office employees working on Head Start, and (4) the Office of the Assistant Secretary for Planning and Evaluation (ASPE).  In support of their motion for a preliminary injunction, the plaintiffs submitted dozens of declarations detailing the harms that their own state agencies and programs had begun to face from the implementation of the March 27 Communiqué and the dismantling of these specific federal sub-agencies.  According to the plaintiffs, the Department placed on administrative leave and planned to fire large portions of the specific sub-agencies' staffs, leaving the sub-agencies unable to perform functions such as laboratory testing; collecting, analyzing, and publishing critical health data necessary to track and treat infectious diseases and improve maternal and infant health outcomes; and providing technical assistance to the states.  In opposition, the government submitted a single declaration stating only that the RIF notices for 300 employees of the National Institute for Occupational Safety and Health (NIOSH) were revoked.  In a detailed 58-page opinion, the district court concluded that the plaintiffs were likely to succeed on their claim that the Department's actions in issuing and implementing the March 27 Communiqué were both arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act (APA), and granted a preliminary injunction.  See New York v. Kennedy, No. 25-cv-196, 2025 WL 1803260 (D.R.I. July 1, 2025); 5 U.S.C. § 706(2)(A) (requiring courts to hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  The government has moved this court for a stay of the injunction pending appeal.  In addition to the government's motion, we have received and considered a response from the plaintiffs and a reply from the government.[2]

---

[1] The August 12 Order clarified a preliminary injunction that the district court issued on July 1, 2025.

[2] A group of "non-profit medical, public health, and community organizations" moved for leave to file an amicus curiae brief in opposition to the government's motion for a stay pending appeal.  We grant the motion, and the proposed brief is accepted as filed.  We consider the amicus brief

The district court's August 12 clarifying order applies only to four HHS sub-agencies and bars the government from further enforcing the March 27 Communiqué as to those sub-agencies by prohibiting the continued execution of any existing RIF notices, issuance of additional RIF notices, or placement of additional employees on administrative leave. The order does not require the reinstatement of any employees. The preliminary injunction applies to: CTP, OHS and Head Start employees in regional offices, several components of the CDC,[3] and ASPE's Division of Data and Technical Analysis.

As the party seeking a stay pending appeal, the government bears the burden of justifying the extraordinary relief it requests. See Nken v. Holder, 556 U.S. 418, 433-34 (2009). That is because "[a] stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" Id. at 427 (first quoting Va. Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958); and then quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926)); see also Rhode Island v. Trump, No. 25-1477, 2025 WL 2621593, at *3 (1st Cir. Sept. 11, 2025). In evaluating the government's stay motion, we must consider four factors: (1) whether the government has made "a strong showing that [it] is likely to succeed on the merits" of its appeal; (2) whether the government has shown that it "will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." Nken, 556 U.S. at 426 (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). The first two factors "are the most critical." Id. at 434. We "rely on the parties to frame the issues for decision." Rhode Island, 2025 WL 2621593, at *3 (quoting New York v. Trump, 133 F.4th 51, 66 (1st Cir. 2025)). Adhering to the party presentation principle is especially essential in the context of emergency stay motions, which require courts to make important decisions on a truncated timeline. See New Jersey v. Trump, 131 F.4th 27, 35 (1st Cir. 2025) (citing Greenlaw v. United States, 554 U.S. 237, 243 (2008)).

The government relies heavily in its motion papers on the Supreme Court's recent interim order granting a stay in McMahon v. New York, 145 S. Ct. 2643 (2025). That order followed our own decision denying a stay in that case. See Somerville Pub. Schs. v. McMahon, 139 F.4th 63 (1st Cir. 2025). Thus, we have carefully reviewed the McMahon order, and the government's stay application to the Supreme Court in McMahon, in evaluating the government's stay request here. The Supreme Court's order in McMahon states in full:

> The application for stay presented to Justice JACKSON and by her referred to the Court is granted. The May 22, 2025 preliminary injunction entered by the United States District Court for the District of Massachusetts, case No. 1:25–cv–10601, is stayed pending the

---

only insofar as it concerns legal issues and positions raised by the parties. See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020).

[3] The CDC components include the National Center for HIV, Viral Hepatitis, STD, and Tuberculosis Prevention, the Division of Reproductive Health (DRH), NIOSH, Office on Smoking and Health, the National Center for Environmental Health, and the National Center on Birth Defects and Developmental Disabilities.

> disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

145 S. Ct. at 2643. Further, in analyzing the government's request for a stay in this case, we adhere to the principle that although the Supreme Court's interim orders are not "conclusive as to the merits," they should guide how federal courts "exercise [their] equitable discretion in like cases." Trump v. Boyle, 145 S. Ct. 2653, 2654 (2025).

We begin with the first stay factor under the Nken test: whether the government has made a "strong showing" that it is likely to succeed on the merits of its appeal. The government makes three merits-based arguments in its stay motion: (1) that the plaintiffs lack Article III standing, (2) that the Civil Service Reform Act (CSRA) divests the district court of jurisdiction to hear this case, and (3) that, under the APA, the plaintiffs cannot challenge the agency action at issue because it is both programmatic and not final, and, in addition, it is neither arbitrary and capricious nor contrary to law. We address each argument in turn.

The government initially argues that it is likely to succeed in showing that the plaintiffs lack Article III standing to bring their claims. Specifically, the government contends that the plaintiffs are relying on a prohibited parens patriae theory of standing, meaning that the plaintiffs allegedly rely only on claimed injuries to their citizens rather than to the states themselves. But the district court made factual findings, based on the record before it, that the plaintiffs alleged myriad injuries to the states themselves, including the cessation of services on which state agencies -- not just residents of the states -- rely, leading to increased costs and burdens on the state agencies' operations. For example, the district court found that the plaintiffs had relied on CDC labs for infectious disease and STD/STI confirmatory testing, which the CDC was no longer performing because of the March 27 Communiqué. As a result, the plaintiffs lack the ability to conduct such critical testing at the volume required, thus undermining their ability to track infectious diseases in their states while also imposing financial harm due to their attempts to use their own resources to fill some of the gap. The government points to no contrary evidence in the record to discredit those factual findings. The government does cite to United States v. Texas, 599 U.S. 670 (2023), to support the following statement: "A state might respond to a reduction in federal services by providing additional state services, but a desire to 'supply social services such as healthcare and education' is not cognizable." The government's statement, however, does not reflect the holding in Texas. In that case, the Supreme Court ruled that the plaintiff states did not have a "legally and judicially cognizable" injury under Article III that could support a suit to require the Executive Branch to "make more arrests or bring more prosecutions" of those charged with violating immigration laws. Id. at 676, 680. As the Court explained, Texas raised "only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law -- here, by making more arrests. Under this Court's Article III precedents and the historical practice, the answer is no." Id. at 684-85 (footnote omitted). That holding is inapposite here because this case does not involve a challenge to the federal government's discretionary authority to decide how many arrests

or prosecutions it will bring against those accused of violating federal law. Instead, this case concerns traditional monetary and operational injuries to the states and their instrumentalities. See Biden v. Nebraska, 600 U.S. 477, 489-91 (2023) (recognizing a state's standing to challenge a federal government action that harms an instrumentality of the state).

In its next Article III standing argument, the government contends that the plaintiffs allege only non-cognizable informational harms that are insufficient to establish Article III standing. To the extent that the plaintiffs' injuries are informational (and only some are), the district court found that the plaintiffs alleged clear "downstream consequences from failing to receive the information." TransUnion LLC v. Ramirez, 594 U.S. 413, 441-42 (2021) (finding no Article III standing when plaintiffs did not allege that they failed to receive any required information but alleged only that they received the information "*in the wrong format*" and, in any event, did not identify any "downstream consequences" from failing to receive information). For example, the plaintiffs alleged that the Department placed on leave the entire staff that operates the DRH's Pregnancy Risk Assessment Monitoring System, which collects, analyzes, and publishes data related to maternal and infant mortality and health. As a result, new data is not being added, and historic data was removed from the website. The plaintiffs rely on this data, which was available only from the Department, to identify and implement state-level interventions that will minimize maternal and infant mortality and morbidity in their states; creating a new state-level database from scratch would be lengthy, costly, and less comprehensive. Again, the government has not pointed to any record facts or legal precedent that would undermine the district court's conclusion that these alleged harms satisfy the requirements of Article III standing.

Under the framework of its Article III arguments, the government also suggests that an injunction requiring the government to produce the information at issue would have been sufficient to redress the plaintiffs' informational injuries. To the extent that the government means to argue that the plaintiffs have not satisfied the redressability prong of the Article III standing inquiry, it has not shown how the invalidation of the March 27 Communiqué as to the specific sub-agencies, and an injunction against the resulting RIF and dismantling of those sub-agencies, would fail to provide plaintiffs with the relief that they seek. As part of its standing arguments, the government further maintains that the plaintiffs' injuries arise from the loss of services to which they are not statutorily entitled -- a contention that may relate to the merits of certain of the plaintiffs' legal claims but that is unconnected to whether their injuries were "concrete and particularized" and "actual or imminent" for Article III purposes. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Accordingly, the government has not met its burden to make "a strong showing" that it is likely to succeed on appeal on the Article III standing arguments it presents in support of its motion to stay.

Relying heavily on McMahon, the government next argues that the district court lacked jurisdiction because the CSRA channels any dispute involving federal personnel decisions to the Merit Systems Protection Board (MSPB). But the McMahon order does not identify the specific grounds for the Court's ruling that the government had met the Nken factors in that case, nor has any other Supreme Court interim order or decision accepted the government's CSRA argument in a like case. See Rhode Island, 2025 WL 2621593, at *8. That is significant because although the government made a CSRA jurisdictional argument in McMahon, it also made a number of other arguments, at least some of which do not apply to this case and are not reasserted

5

here. For instance, the government contended in McMahon that the plaintiffs in that case alleged injuries that were "causally remote" from the challenged conduct or were "self-inflicted." Stay Application at 3-4, 24-25, McMahon, 145 S. Ct. 2643. Indeed, the government disputed the notion that the RIF at issue in that case would affect the "quality or promptness of Department services," see id. at 3 -- something it does not do with respect to the specific sub-agencies covered by the district court's preliminary injunction here.

Further, the government also cites in support of its CSRA argument (and elsewhere in its papers) the Supreme Court's interim order in Trump v. Am. Fed. of Gov't Emps. (AFGE), 145 S. Ct. 2635 (2025) (mem.), which stayed an injunction of the same Executive Order that prompted the March 27 Communiqué. That interim order, however, points to the opposite conclusion. Indeed, the AFGE order is doubly unhelpful to the government. First, the Supreme Court explicitly did not rule in AFGE "on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order," id. at 2635 -- that is, it specifically did not rule on the type of actions at issue in this case. Second, even though the government raised the same CSRA argument in AFGE that it asserts here, the Court's determination that the government was likely to succeed in establishing that the Executive Order was lawful, a necessarily merits-based ruling, indicates that the Supreme Court concluded that the district court likely had jurisdiction to make that decision. Thus, in issuing its interim order in AFGE, the Supreme Court likely decided that the CSRA did not funnel the dispute at issue -- which the government argues to us is similar to this one -- to the MSPB.[4]

---

[4] The government also suggests that the district court lacked jurisdiction because plaintiffs alleged that one of the sub-agencies could not process a grant extension and all grant-related suits must be heard by the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. This argument finds no support in the caselaw that the government cites. Importantly, this case does not challenge the cancellation of grants. Instead, it concerns the dismantling of sub-agencies and a RIF at the Department. Although the plaintiffs produced evidence about the failure to process one grant to support their claims that the sub-agencies were no longer functioning after the implementation of the March 27 Communiqué, the inclusion of that allegation does not transform their suit into a demand for money damages or an order "to enforce a contractual obligation to pay money." Dep't of Educ. v. California, 604 U.S. 650, 651 (2025) (per curiam) (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002)). Thus, the government's argument on this point is contrary to Supreme Court precedent. See id. ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." (quoting Bowen v. Massachusetts, 487 U.S. 879, 910 (1988))); see also Nat'l Insts. of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658 (2025) (mem.) (denying government's application to stay agency-wide guidance but holding that district court lacked jurisdiction to hear claims "based on" individual terminated grants "or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants" (quoting Dep't of Educ., 604 U.S. at 650)).

As for the merits of the plaintiffs' APA claims, the government does not meaningfully engage with the district court's analysis of those claims.[5] The government does assert that the March 27 Communiqué was not reviewable "final agency action," 5 U.S.C. § 704, but it does not explain how it was not a "'consummation' of the agency's decisionmaking process" and did not have "legal consequences," given that it was followed, just days later, by the Department's dismantling of sub-agencies and a RIF impacting 10,000 employees. Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). The government also argues that the plaintiffs' claims call for "general judicial review of [an agency]'s day-to-day operations" (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 899 (1990)), an argument much like one we rejected in New York, 133 F.4th at 67. We cannot conclude that the government has made a strong showing of likely success on this argument, however, given that the plaintiffs challenge a particular directive, not a "variety of programmatic deficiencies" or "'all aspects of' a program." Id. (quoting Lujan, 497 U.S. at 890 n.2). The government next invokes the well-recognized discretion afforded to agencies in making personnel decisions, but the case it cites -- Sampson v. Murray, 415 U.S. 61 (1974) -- did not involve review of agency action under the APA.[6] See Somerville Pub. Schs., 139 F.4th at 73. As to whether the Department's actions in issuing and implementing the March 27 Communiqué were arbitrary and capricious, the government does not put forth any argument that HHS "examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made." Food & Drug Admin. v. Wages & White Lion Invs., L.L.C., 604 U.S. 542, 567 (2025) (quoting the "well-worn arbitrary-and-capricious standard" from Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)). Nor does it refute the district court's explicit findings that there was no such "exam[ination of] the relevant data" or "rational connection" here. As the district court found, the HHS Secretary admitted that the Department did not examine employees' job responsibilities before removing them because that would "'take too long' and would sacrifice 'political momentum.'" New York, 2025 WL 1803260, at *14. Because the government has not met its burden to make a "strong showing" that it will succeed on appeal in overturning the district court's arbitrary-and-capricious ruling, we need not address the district court's alternative holding that the challenged action was also likely contrary to law.

---

[5] Insofar as the government contends that the preliminary injunction is overly broad, as it briefly mentions in the section of its motion addressing Article III standing, that argument is insufficiently developed and therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). The government does not explain, for instance, how the district court abused its discretion by temporarily enjoining further implementation of the March 27 Communiqué at four particular sub-agencies when the plaintiffs submitted uncontroverted evidence of harm flowing from such implementation. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 14 (1st Cir. 2000).

[6] Another case cited by the government, Markland v. Off. of Personnel Mgmt., 140 F.3d 1031 (Fed. Cir. 1998), also does not support its APA argument. That case involved deferential review of an MSPB decision and merely noted that agencies are afforded "wide discretion in conducting a reduction in force," which would not be impeded "absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like." Id. at 1033 (quoting Deweese v. Tenn. Valley Auth., 35 F.3d 538, 541 (Fed. Cir. 1994)).

Having failed to show a likelihood of success on the merits, the government's two pages of argument on the three remaining Nken factors do not meet its burden to justify a stay. As to the second prong of the Nken test, we do credit the government's contention that it would be irreparably harmed if it were erroneously required, during the pendency of the preliminary injunction, to pay salaries to employees it would otherwise terminate under the RIF. See Dep't of Educ., 604 U.S. at 652; Nat'l Insts. of Health, 145 S. Ct. 2658; Rhode Island, 2025 WL 2621593, at *9. Nevertheless, we conclude that this argument, like the government's contention that irreparable harm arises from encroachment on its Article II authority, cannot be enough to meet the government's burden for a stay when the government has failed to make a strong showing of a likelihood of success on the merits -- that is, when it has not established that it is likely to prevail on appeal in establishing the lawfulness of its challenged actions.

Turning to whether a stay would substantially injure the plaintiffs, the government offers one sentence in its stay motion addressing this third prong of the Nken test, claiming that "plaintiffs have not established irreparable injury warranting extraordinary relief even outside the government-personnel context, let alone made a showing that 'override[s the] factors cutting against the general availability of preliminary injunctions in Government personnel cases.'" (Quoting Sampson, 415 U.S. at 84.) In making this argument, the government has not pointed to any grounds to question the district court's findings of substantial harm to the plaintiffs if the withdrawal of services and support that began with the March 27 Communiqué continues.[7] See Rhode Island, 2025 WL 2621593, at *10 (distinguishing the harms to a terminated employee considered in Sampson from injuries of state plaintiffs affected by the cessation of services). As we have noted, those findings were based on dozens of declarations, spanning hundreds of pages, from members of state agencies -- commissioners of health departments, directors of state laboratories, employees of education departments, and the like. The government does not explain how the district court clearly erred in crediting these uncontroverted facts. This conclusory refutation of the district court's extensive factual findings is not enough to meet the government's burden to show that a stay would not substantially injure the plaintiffs.

The government fares no better with Nken's "public interest" prong. Seeing as the government barely challenges the district court's view that the plaintiffs' "arbitrary-and-capricious" claim is likely to succeed, we are especially mindful that "there is generally no public interest in the perpetuation of unlawful agency action." Somerville Pub. Schs., 139 F.4th at 76 (quoting League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)); see Rhode Island, 2025 WL 2621593, at *10.

For all these reasons, the motion for a stay pending appeal is DENIED.

So ordered.

---

[7] At this stage, the question is whether the government has shown that other parties to the litigation, such as the plaintiffs, will not be "substantially" injured by a stay. See Rhode Island, 2025 WL 2621593, at *9. And the burden is on the government -- rather than on the plaintiffs as the government's stay papers suggest -- to show that there would be no substantial injury to the plaintiffs from a stay. See New Jersey, 131 F.4th at 41.

By the Court:

Anastasia Dubrovsky, Clerk

cc:
Christopher R. Hall
Lauren S. Zurier
Kevin M. Bolan
Melissa N. Patterson
Steven A. Myers
Elizabeth Themins Hedges
Christian Dibblee
Rabia Muqaddam
Daniel S. Magy
Molly Thomas-Jensen
Jessica Ranucci
Andres Ivan Navedo
Molly Brachfeld
Spencer Wade Coates
Cynthia Alexander
Kelsey E. Endres
William David McGinty
Kathryn M. Sabatini
Sarah Rice
Chandana Pandurangi
Dorothea C. Lindquist
Alexa Gabriela Salas
Michael Louis Newman
Panchalam Seshan Srividya
Neli Nima Palma
Kathleen Boergers
Crystal M. Adams
Jeanelly Orozco Alcala
Jesse P. Basbaum
Virginia Corrigan
David Moskowitz
Tanya Wheeler
Michael Kenneth Skold
Vanessa L. Kassab
Ian R. Liston
Andrew C. Mendrala
David Dana Day

Kaliko‘onālani D. Fernandes
Alex Hemmer
Katharine Pinckney Roberts
Caithlyn McEllis
Margaret Machaiek
Virginia A. Williamson
Neil Giovanatti
Lindsey E. Middlecamp
Jessica L. Palmer
Justine M. Longa
Astrid Carrete
Erin Galli
Ryan P. Kane
Charlotte Gibson
Christina S. Marshall